UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

FILED

SEP 0 7 2007

DENNIS P. IAVARONE, CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 5:06-HC-2195-BR |
| | ) | |
| GRAYDON EARL COMSTOCK, JR. | ) | |
| | ) | |
| Respondent. | ) | |

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 5:06-HC-2202-BR |
| | ) | |
| SHANE CATRON, | ) | |
| | ) | |
| Respondent. | ) | |

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 5:06-HC-2205-BR |
| | ) | |
| THOMAS MATHERLY, | ) | |
| | ) | |
| Respondent. | ) | |

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 5:06-HC-2206-BR |
| | ) | |
| MARVIN VIGIL, | ) | |
| | ) | |
| Respondent. | ) | |

| UNITED STATES of AMERICA, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 5:06-HC-2212-BR |
| | ) |
| MARKIS REVLAND, | ) |
| | ) |
| Respondent. | ) |

In July 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 (the Walsh Act), Pub. L. No. 109-248, 120 Stat. 587 (2006), to combat sexual violence and the exploitation, molestation, and abuse of children in this country. Described by Senator Orrin Hatch as the "most comprehensive child crimes and protection bill in our Nation's history," 152 Cong. Rec. S 8012 (2006), the Act creates a National Sex Offender Registry with uniform registration standards, creates criminal penalties for individuals who fail to comply with the Act's registration requirements, increases federal criminal penalties for violent and sexually violent crimes against children, provides grants to states to help states institutionalize sex offenders who have shown they are unable to control their behavior, creates a task force that will take action to make it more difficult for sexual predators to reach children on the Internet, and establishes a National Child Abuse registry. Much of the legislation is designed to close the gap between federal and state efforts to identify, track, and confine sexual predators.

Respondents' motions to dismiss in these cases present the court with questions of constitutional authority and substantive due process, among others, with respect to only one provision of the Walsh Act,[1] that which permits the civil commitment of sexually dangerous persons. Those questions are: whether the federal government has the constitutional authority to

---

[1] The approximately 59 pages of new laws and amendments to existing laws that comprise the Walsh Act, Pub. L. No. 109-248, are codified in numerous scattered sections of 18 U.S.C. and 42 U.S.C.

seek the indefinite commitment of a person to prevent criminal conduct that is almost exclusively proscribed by the States, without requiring a nexus between the commitment and an identifiable federal interest; and whether a statute requiring a factual finding of criminal conduct as a prerequisite to indefinite commitment may permit such commitment where that conduct is not proven beyond a reasonable doubt. Having carefully considered the arguments by all parties, the court concludes, for the reasons that follow, that the civil commitment provision of the Walsh Act is not a necessary and proper exercise of Congressional authority and that the use of a clear and convincing burden of proof violates the substantive due process rights of those subject to commitment under the statute.

## Procedural History

Regarding the first filed of these cases, Graydon Comstock pled guilty on 4 October 2000 to one count of "Receipt [by computer] of materials depicting a minor engaging in sexually explicit conduct" in violation of 18 U.S.C. § 2252(a)(2), and to one count of forfeiture. He was sentenced to a 37-month prison term to be followed by a three-year period of supervised release. His term of imprisonment expired on 8 November 2006. Comstock is being held in prison, however, pursuant to the government's certification of Comstock as a "sexually dangerous person" on 2 November 2006, under the civil commitment provision of the Walsh Act, 18 U.S.C. § 4248. Comstock's release has been stayed pursuant to § 4248 for the duration of these proceedings, and he remains confined at FCI-Butner.[2]

---

[2] Respondent Shane Catron, found incompetent to stand trial for aggravated sexual abuse of a minor and abusive sexual conduct under 18 U.S.C. § 4241, is currently confined at FMC-Butner. See Ca No. 5:06-HC-2202. Respondent Thomas Matherly was sentenced to a 41-month term to be followed by a three-year period of supervised release based on his guilty plea to one count of possession of child pornography in violation of 18 U.S.C. §

(continued...)

In each of these cases, the Federal Public Defender on behalf of the respondents has filed

motions to dismiss the petitions for hearings.[3]  Respondents filed a motion to dismiss the petition

pertaining to Comstock on 15 February 2007 and a second motion to dismiss on 20 March 2007.

The government filed a consolidated response to these motions on 5 April 2007, and respondents

filed a reply on 13 April 2007.  This court heard oral argument on 7 May 2007.

## 18 U.S.C. § 4248

Section 4248, entitled "Civil Commitment of Sexually Dangerous Persons," allows the

federal government to initiate commitment proceedings with respect to federal prisoners whose

sentences are about to expire, persons committed to the custody of the Attorney General under §

4241(d) based on incompetence to stand trial, and persons against whom all criminal charges

have been dismissed solely for reasons relating to their mental condition, and, pursuant to court

order, to commit indefinitely those prisoners found to be "sexually dangerous persons."  To

initiate civil commitment proceedings under § 4248(a), the Bureau of Prisons (BoP) may certify

any of the foregoing individuals as a "sexually dangerous person" and effectively stay the release

of that individual for the duration of the § 4248 proceedings.  A certified individual is entitled to

a hearing, and if the court finds "by clear and convincing evidence that the person is a sexually

---

[2](...continued)

2252(a)(5)(B) and (b)(2).  Matherly's term of imprisonment expired on 23 November 2006, and he is currently confined at FCI-Butner as a result of certification under 18 U.S.C. § 4248.  See Ca No. 5:06-HC-2205.  Respondent Markis Revland was sentenced to a 60-month term of imprisonment to be followed by a three-year period of supervised release based on his plea of guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B).  He is currently confined at FCI-Butner.  See Ca No. 5:06-HC-2212.  Respondent Marvin Vigil was sentenced to a 96-month term of imprisonment to be followed by a three-year period of supervised release based on a plea of guilty to one count of sexual abuse of a minor in violation of §§ 2242(a) and 2246.  He is currently confined at FCI-Butner.  See Ca No. 5:06-HC-2206.

[3] While these cases have not been consolidated, substantially identical motions have been filed in each, and each motion raises questions as to the constitutionality of 18 U.S.C. § 4248.  The court will address these motions together.

dangerous person," the court must commit the individual to the custody of the Attorney General for care and treatment until a state will assume responsibility or until "the person's condition is such that he is no longer sexually dangerous to others" or will not be sexually dangerous to others if released under an appropriate regimen of care or treatment. 18 U.S.C. § 4248(d). A committed individual has a right to request a review of his commitment every 180 days. 18 U.S.C. § 4247(h).

To civilly commit an individual as a "sexually dangerous person," the BoP must provide "clear and convincing evidence" that the person "has engaged or attempted to engage in sexually violent conduct or child molestation *and* . . . is sexually dangerous to others" as defined by 18 U.S.C. § 4247(a)(6). 18 U.S.C. § 4247(a)(5) (emphasis added). A person is sexually dangerous to others if the "person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). The statute does not define the terms "sexually violent conduct" or "child molestation."

### Discussion

The Supreme Court has upheld against constitutional challenge at least one sexually violent predator act passed by a state legislature, see Kansas v. Hendricks, 521 U.S. 346 (1997), and Kansas v. Crane, 534 U.S. 407 (2002), and numerous states have sexually violent predator acts similar to the one adopted in Kansas. The government argues that § 4248 was carefully drafted with this Supreme Court precedent in mind. (Gov't Br. at 15.) Respondents argue that the broadly applicable commitment scheme outlined in § 4248 differs substantially from the carefully drawn, narrowly applicable scheme addressed in Hendricks and Crane and that § 4248

-5-

Case 5:06-hc-02202-BR   Document 30   Filed 09/07/07   Page 5 of 59

is unconstitutional for the following reasons:

1)      a commitment under § 4248 is a criminal proceeding and thus violates the double jeopardy clause, the ex post facto clause, the 8th Amendment prohibition against cruel and unusual punishment, and the 6th Amendment right to jury trial;

2)      Congress exceeded its power under the Commerce Clause in enacting § 4248;

3)      application of the clear and convincing standard of proof in a § 4248 hearing violates due process; and

4)      § 4248 violates substantive due process and equal protection under the 5th Amendment.

The court notes, as an initial matter, that respondents' arguments concerning the purported lack of Congressional authority to enact § 4248 and the use of the clear and convincing burden constitute cognizable facial challenges to the constitutionality of § 4248. The government argues that facial challenges are disfavored and inappropriate. (Gov't Br. at 6.) "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). See also Sabri v. United States, 541 U.S. 600, 609 (2004). Section 4248's commitment scheme applies to at least three categories of individuals: prisoners whose sentences are about to expire at the time of certification, such as Comstock, Matherly, Vigil, and Revland; individuals who were committed to federal custody pursuant to § 4241 based on incompetence to stand trial, such as Catron; and individuals against whom all criminal charges have been dropped as a result of their mental condition. By advancing a facial challenge to the *entire* commitment scheme of § 4248, the government argues, respondents have violated the traditional rule that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may

-6-

conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 767 (1982) (citing Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)). See also Los Angeles Police Dep't v. United Reporting Publishing Corp., 528 U.S. 32, 38 (1999).

If Congress lacked the authority to enact the civil commitment scheme at issue, however, the commitment scheme could not be constitutionally applied. Even if Congress does theoretically have the authority to provide for the civil commitment of sexually dangerous persons in federal custody, § 4248 could not be constitutionally applied to any person if it is not a "necessary and proper" means of achieving that ostensibly legitimate end. Likewise, because § 4248's explicitly requires the application of the clear and convincing standard of proof to determine the permissibility of commitment, the statute cannot be applied constitutionally to anyone if the application of that standard violates due process.

## I. Civil vs. Criminal Nature of Section 4248

Respondents argue that the commitment scheme set up by § 4248 operates as a form of preventive detention and, as such, constitutes a criminal proceeding. (FPD Br. at 23.) Supreme Court precedent pertaining to commitment generally and to commitment of sexually dangerous individuals pursuant to state laws specifically dictates that § 4248 be characterized as a civil scheme.

In Kansas v. Hendricks, the Supreme Court reviewed a challenge to the constitutionality of the Kansas Sexually Violent Predator Act (KSVPA) and held, among other things, that the KSVPA's commitment scheme did not establish criminal proceedings and that involuntary confinement pursuant to that statute was not punitive. 521 U.S. at 361-63. In so holding, the

-7-

Court reviewed: the Kansas legislature's intent; whether primary purposes of the KSVPA were retribution or deterrence; the restriction of the freedom of mentally ill persons as a legitimate, nonpunitive government objective; the potentially indefinite nature of the confinement permitted by the statute; the state's use of various procedural safeguards; and the availability of treatment for individuals committed. Id. at 361-69.

Section 4248 is not sufficiently distinguishable from the KSVPA for purposes of the civil/criminal analysis to justify a different result in this case. Congress clearly expressed its intent that § 4248 be a civil commitment proceeding, see 18 U.S.C. § 4248 ("Civil Commitment of a sexually dangerous person"),[4] and the apparent goal of the statute is to protect the community from sexually violent predators. As in Hendricks, 521 U.S. at 363, the purpose of the Walsh Act's federal commitment provision would not be considered retributive because it does not affix culpability for prior criminal conduct and no finding of scienter is required for commitment. Because the statute is explicitly aimed at confining people who have been found to have serious difficulty controlling their conduct, it cannot be said that the statute serves a deterrent purpose. As Justice Scalia wrote in his dissent in Crane, 534 U.S. at 420, "[o]rdinary recidivists *choose* to reoffend and are therefore amenable to deterrence through the criminal law; those subject to civil commitment under [the KSVPA] because their mental illness is an affliction and not a choice, are unlikely to be deterred." See also Hendricks, 521 U.S. at 362-63; Allen v. Illinois, 478 U.S. 364, 373-74 (1986) (commitment proceedings under the Illinois Sexually Dangerous Persons Act, designated civil by the Illinois legislature, were not criminal

---

[4] The commitment provision of the Walsh Act is codified in Chapter 313 of Title 18 of the United States Code alongside other federal civil commitment provisions.

-8-

within the meaning of the self-incrimination clause of the Fifth Amendment); In re Young, 857

P.2d 989, 996-99 (Wash. 1993) (holding similar Washington statute to be civil) (superseded by

statute on other grounds).

Several recent decisions addressing constitutional challenges to the Sex Offender

Registration and Notification Act (SORNA), which is Title I of the Walsh Act, 42 U.S.C. §§

16901 et seq., have concluded that the SORNA is civil and nonpunitive. See United States v.

Mason, No. 6:07-cr-52-Orl-19Jgg, 2007 WL 1521515 (M.D. Fla. May 22, 2007); United States

v. Hinen, 487 F. Supp. 2d 747, 757 (W.D. Va. 2007); United States v. Templeton, No. CR-06-

291-M, 2007 WL 445481 (W.D. Okla. Feb. 7, 2007); United States v. Madera, 474 F. Supp. 2d

1257 (M.D. Fla. 2007) (relying on Smith v. Doe, 538 U.S. 84, 96 (2003), and Hendricks for

proposition that the Walsh "Act (and SORNA within it) is a 'civil, nonpunitive' law").

Because analogous case law indicates that § 4248 is properly construed as a civil scheme,

respondent's double jeopardy, ex post facto, cruel and unusual punishment, and jury trial claims,

cognizable only in the criminal or punitive context, do not require the dismissal of the

government's petitions for hearing in these cases.

## II. The Federal Government's Authority to Civilly Commit Sexually Dangerous Persons: The Necessary and Proper Clause

Statutes are presumed constitutional. United States v. Morrison, 529 U.S. 598, 607

(2000). "Due respect for the decisions of a coordinate branch of Government demands that we

invalidate a congressional enactment only upon a plain showing that Congress has exceeded its

constitutional bounds." Id. As the Morrison Court explained, "[e]very law enacted by Congress

must be based on one or more of its powers enumerated in the Constitution. 'The powers of the

-9-

legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' Marbury v. Madison, 1 Cranch 137, 176, 2 L.Ed. 60 (1803)." Morrison, 529 U.S. at 607.

Congress did not explicitly identify the source of federal authority on which it relied in enacting the civil commitment provision of the Walsh Act. Respondents argue that § 4248 exceeds Congressional authority under the Commerce Clause. In its brief, the government does not rely on the Commerce Clause, but rather contends that the court need not reach the Commerce Clause issue to decide the case,[5] arguing that Congress had the authority to enact § 4248 pursuant to the Necessary and Proper Clause, U.S. Const., Art. I, § 8, cl. 18. Specifically, the government argues that Congress's power to prevent the commission of certain crimes by persons in the custody of the BoP flows from Congress's power to criminalize that conduct in the first place, to prosecute those crimes, and to regulate the persons who legitimately enter the custody of the BoP as a result of such criminal prosecutions. (Gov't Br. at 7.) The government argues that civil commitment under § 4248 is thus a permissible expression of its regulatory power to prevent criminal conduct.

The parties' respective arguments regarding the federal government's authority to civilly commit sexually dangerous individuals in the manner prescribed by § 4248 pose significant questions as to the appropriate interpretation and application of the Necessary and Proper Clause. That clause provides Congress with the power "[t]o make all Laws which shall be necessary and

---

[5] At oral argument, however, the government contended that civil commitment under § 4248 is necessary and proper to both its authority to prosecute federal crimes and its Commerce Clause powers, to the extent it has criminalized conduct pursuant to those powers, (Trans. at 25). Accordingly, the court will consider wether the Commerce Clause provides the requisite authority.

proper for carrying into Execution [its enumerated] powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Accordingly, a Congressional enactment must meet three criteria to be valid under the Necessary and Proper Clause: it must be 1) necessary, and 2) proper, to 3) the exercise of a power vested in the government by the Constitution. As Justice Marshall wrote in M'Culloch v. Maryland, 17 U.S. 316, 421 (1819), regarding the scope of the Clause, "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

Because the government has invoked the Necessary and Proper Clause, the court must examine carefully the enumerated and incidental powers upon which the government relies as a source of federal authority to enact § 4248. In addition, even assuming § 4248 is tied to the exercise of an identifiable constitutional power, the court must determine whether § 4248 is a necessary and proper means of effectuating that power. See generally, Gary Lawson and Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L.J. 267, 285 (Nov. 1993)(detailing textual and structural arguments that "proper," as used in the Sweeping Clause, is a term distinct from and supplementary to, "necessary," and that it functions as an integral part of the constitutional design for a limited national government, i.e., as a substantive, jurisdictional limitation on Congressional power).

### A. Analysis of Congressional Authority

Of the powers suggested by the government, the Commerce Clause is the only one that is actually enumerated in the Constitution. U.S. Const., Art. 8. The other powers cited by the

government -- such as the power to criminalize and punish certain conduct, and the power to prosecute – are certainly recognized government powers; however, those powers are themselves necessary and proper exercises of power premised upon enumerated powers. Congress's power to criminalize certain conduct is necessarily defined and circumscribed by the enumerated powers, such as the Commerce Clause, or the Spending Clause. The power to prosecute crimes is, of course, an incidental power bounded by the limited power to criminalize. And, the power to regulate those legitimately in federal custody is bounded by the individual rights of the persons in custody as described by the Constitution and by the limitations on the powers from which that power to regulate derives. Moreover, as the government acknowledged at oral argument, (Trans. at 26), Congressional power under the Necessary and Proper Clause is, itself, "limited and capped by other constitutional prescriptions . . . [f]or instance, the Tenth Amendment," (id. at 26), and the substantive due process rights of individuals, (id. at 27). The language of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the States respectively, or to the people," U.S. Const., Amend. X, raises important concerns regarding "appropriate means" and the "letter and spirit of the Constitution" when this court is faced with federal legislation in an area that is both not explicitly delegated to the United States *and* traditionally governed by the several states in an appropriate exercise of their police and *parens patriae* powers. Accordingly, the court turns to an examination of the powers upon which § 4248 is arguably premised.

**1. The Power to Prosecute**

One of the categories of individuals subject to commitment under § 4248 is comprised of individuals who have previously been committed to the custody of the Attorney General pursuant

-12-

to section § 4241(d), which allows the temporary commitment of individuals suffering from a mental disease or defect that renders them mentally incompetent to stand trial.[6] The government offers Greenwood v. United States, 350 U.S. 366 (1956), in support of its position that the federal government may legislate to maintain custody over individuals where the federal government has an unexhausted power to prosecute, (Trans. at 39), as in the case of an individual subject to commitment under § 4248 by way of previous commitment under § 4241(d) based on incompetence to stand trial.

In Greenwood, the Supreme Court upheld Congress's power to civilly commit an incompetent individual pursuant to 18 U.S.C. §§ 4246 and 4248. At that time, § 4246 permitted the temporary, pre-trial commitment of an individual found incompetent to stand trial, and § 4248 permitted the further commitment of the same individual "until the sanity or mental competency of the person shall be restored or until the mental condition of the person is so improved that if he be released *he will not endanger the safety of the officers, the property, or other interests of the United States,* or until suitable arrangements have been made for the custody and care of the prisoner by the State of his residence, whichever event shall first occur." Greenwood, 350 U.S. at 369 n.4 & 374 (emphasis added).

While Justice Frankfurter rejected the federalism challenge mounted in Greenwood, he explicitly defined the limited extent of federal power to deal with civil commitment of incompetent and dangerous individuals. He wrote that where the petitioner at issue came legally into the custody of the United States but was found unable to stand trial because of his mental condition, "*the power that put him into such custody – the power to prosecute for federal*

_____

[6] Respondent Catron is one such individual.

-13-

*offenses – is not exhausted.* Its assertion in the form of the pending indictment persists. . . .

[Such a] commitment, and therefore the legislation authorizing commitment in the context of this

case, involve an assertion of authority, duly guarded, auxiliary to incontestable national power.

As such it is plainly within congressional power under the Necessary and Proper Clause, Art. I, 8,

cl. 18." Id. at 375 (emphasis added).

Accordingly, in Greenwood, the Supreme Court recognized that civil commitment of a

mentally ill and dangerous individual who is subject to a pending indictment but who is found to

be incompetent to stand trial is a legitimate exercise of Congressional power and that the

statutory provision for such commitment was necessary and proper to the government's power to

prosecute. Thus, to the extent that there is an indictment pending against an individual like

Catron, the power to prosecute is not exhausted, and the Supreme Court has held that Congress

has the power to authorize civil commitment where release would endanger the interests of the

United States.[7] The civil commitment provision considered by the Greenwood Court, however,

differs markedly from § 4246 and § 4248 as they exist today. Accordingly, Greenwood is not

dispositive of the issue of Congressional power in the context of § 4248 cases as the government

contends.

Importantly, Greenwood did not address the source of Congressional authority to civilly

commit a prisoner whose sentence is about to expire, such as respondents Comstock, Matherly,

___

[7] The limited holding of Greenwood may be characterized as one further limited by narrow statutory
language requiring a potential harm to the "interests of the United States" to justify federal commitment. While that
statutory language has been changed to permit commitment if a person's release would "create a substantial risk of
bodily injury to another person or serious damage to property of another," the court has not located any case law
actually addressing a challenge to Congress's authority to enact such a civil commitment scheme designed to
commit, among others, prisoners whose sentences are about to expire and with respect to whom the power to
prosecute has arguably been exhausted simply to prevent generalized, nonspecific harm to the public.

-14-

Vigil and Revland,[8] persons as to whom the power to prosecute is, in fact, exhausted. With respect to such individuals, an attempted commitment under § 4248 is a governmental attempt to control the conduct and circumstances of individuals who are in federal custody after "the power to prosecute for federal offenses" has been exhausted and after the sentences of imprisonment have been served. Likewise, if all criminal charges against an individual have been dropped for reasons pertaining to his mental condition, any further government action against that individual could not be supported by the power to prosecute. The Greenwood Court explicitly declined to provide guidance as to whether such an exercise of power is permissible. 350 U.S. at 376 ("We decide no more than the situation before us presents and equally do not imply an opinion on situations not now before us.").

The government makes some effort to bring the commitment of a prisoner whose sentence is about to expire within the ambit of Congress's power to prosecute, offering United States v. Plotts, 347 F.3d 873 (10th Cir. 2003), as an example of a case in which a court has held that Congress has the "necessary and proper authority to help and assist the executive in its prosecutorial functions," (Trans. at 25-26).[9]

In Plotts, the defendant pled guilty to receiving child pornography over the Internet and to a count of criminal forfeiture, and he was ultimately required, as a condition of supervised release, to cooperate in the collection of his DNA during that period of supervised release. The

_____

[8] In fact, respondents Comstock's and Matherly's sentences have already expired, and both inmates remain in federal custody solely as the result of the statute challenged here.

[9] It would appear somewhat contradictory to support the constitutional authority to propagate a "civil" commitment scheme by reference to a power to prosecute "criminal" conduct. As the government itself has argued, § 4248 serves a regulatory or civil function and, in that sense, when applied to preventively detain individuals who have been sentenced and who have served time for criminal offenses, could not be accurately described as a necessary and proper aid to the "prosecution" of criminal conduct.

-15-

defendant argued, in reliance on <u>United States</u> v. <u>Lopez</u>, 514 U.S. 549, 561 (1995), and <u>Morrison</u>, that Congress exceeded its power under the Commerce Clause in enacting the DNA Act, 18 U.S.C. § 3583(d). The Tenth Circuit approved a DNA collection scheme applicable to an individual as a condition of his supervised release, concluding that the DNA Act was a valid exercise of Congressional power under the Necessary and Proper Clause. <u>Plotts</u>, 347 F.3d at 877. The court concluded that, if the DNA Act were construed as a civil sanction for certain criminal conduct, the Act would be "necessary and proper to the exercise of the Commerce Clause." <u>Id</u>. at 879. If, on the other hand, the Act were construed as a law enforcement tool, the "Act is a law necessary and proper to the Executive's constitutionally delegated law enforcement powers." <u>Id</u>. at 879. In this context, the court found that the defendant had pled guilty to a crime that was a valid exercise of the Commerce Clause power, and that the Necessary and Proper Clause "entrusts Congress with the power to pass laws to aid the Executive in prosecuting those who, like Mr. Plotts, violate federal criminal laws." <u>Id</u>. The federal government's right to prosecute and punish, the court found, would be severely hampered "without investigative techniques like the DNA Act." <u>Id</u>. at 880. The court illustrated the rational link between the provisions of the DNA Act and the *enforcement* of a valid federal criminal law, explaining that the DNA samples collected from persons convicted of federal crimes were organized into a national database enabling federal, state and local crime labs to exchange and compare information and to link crimes to each other and to convicted offenders.

Unlike the DNA Act, § 4248 is not an investigative tool and it does not aid in the prosecution or enforcement of federal criminal laws. Rather, it provides indefinite detention or commitment of persons who have not necessarily been convicted of sexually violent crimes or

-16-

child molestation to prevent the future commission of sexually violent acts and child molestation. Moreover, the DNA Act regulates the federal government's interaction with persons in federal custody during the terms of their sentences. It does not attempt to regulate the behavior or constrain the liberty of individuals after the expiration of the sentences they served for their criminal convictions as § 4248 does.

The court concludes that civil commitment of sexually dangerous persons whose prison sentences are about to expire is not a necessary and proper extension of Congress's power to prosecute federal crimes. Another source of power must support the use of the necessary and proper authority in this context.

### 2. The Commerce Clause Power

Like prohibiting the possession of guns within a school zone, 18 U.S.C. § 922(q)(1)(A), or creating a federal civil remedy for the victims of gender-motivated crimes of violence, 42 U.S.C. § 13981, ensuring that pedophiles and other sexually dangerous persons are not permitted to prey on women and children in our communities is a laudable goal. Whether the federal government has the power under the Commerce Clause or, by extension, the Necessary and Proper Clause, to accomplish that end is another matter entirely.

Lopez and Morrison suggest that § 4248 would be found unconstitutional if it were premised solely upon Congress's Commerce Clause authority. Like the Gun Free School Zones Act at issue in Lopez and section 13981 of the Violence Against Women Act of 1994, which was considered in Morrison, § 4248 "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." Morrison, 529 U.S. at 613. Cf., United States v. Templeton, No. CR-06-291-M, 2007 WL 445481 (W.D.

-17-

Okla. Feb. 7, 2007) (holding that the federal failure to register as a sex offender statute, 18

U.S.C. § 2250(a)(2)(B), a part of the Walsh Act, does not violate the Commerce Clause because

the statute includes a jurisdictional nexus as it applies only to those who have been convicted of

sex offenses and who travel in interstate or foreign commerce and thus specifically involves

persons in interstate travel, an appropriate subject of Congress's Commerce Clause power);

Hinen, 487 F. Supp. 2d at 757-78 (same); Mason, 2007 WL 1521515 at *7 (same). Indeed, at

oral argument, the government acknowledged that § 4248 does not contain a jurisdictional

element providing a Commerce Clause nexus. (Trans. at 23.)

In addition, § 4248 is not an example of legislation "regulating activity substantially

affecting interstate commerce," Morrison, 529 U.S. at 610, nor does it appear to be a necessary

part of a more general regulation of interstate commerce, see Gonzales v. Raich, 545 U.S. 1, 37

(2005) (Scalia, J., concurring). Rejecting the argument that Congress could "regulate

noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on

interstate commerce," the Supreme Court in Morrison preserved "one of the few principles that

has been consistent since the Clause was adopted. The regulation and punishment of intrastate

violence that is not directed at the instrumentalities, channels, or goods involved in interstate

commerce has always been the province of the States." Morrison, 529 U.S. at 617-18. Even if §

4248 cannot accurately be described as a punishment, it is most certainly an attempted regulation

of violence that is not directed at interstate commerce.

Lopez and Morrison invalidated laws for lack of adequate connection to the federal

regulation of commerce. In Lopez, the Court struck down a criminal prohibition, and in

Morrison, the Court struck down a federal civil remedy for criminal conduct. Both statutes were

-18-

Congressional attempts to regulate noneconomic activity. And in both, the Supreme Court rejected the "pil[ing] of inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States," Lopez, 514 U.S. at 567. See also id. at 577 (Kennedy, J., concurring) ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur"). The restrictiveness of the Supreme Court's analyses in Lopez and Morrison of the Commerce Clause, an actual enumerated power, is no less applicable and perhaps more so, in the context of the Necessary and Proper Clause, a provision that, by definition, permits action merely incidental to an enumerated power. See Raich, 545 U.S. at 65 (Thomas, J., dissenting) (just as allowing Congress to regulate intrastate, noncommercial activity under the Commerce Clause would confer on Congress a general police power over the Nation, "[t]his is no less the case if Congress ties its power to the Necessary and Proper Clause"). In the context of the Necessary and Proper Clause, even more than in the Lopez and Morrison Commerce Clause scenarios, the danger of allowing the federal government to expand the scope of its powers by way of inference and attenuation and to encroach upon the authority and power traditionally reserved to the states is significant. See Morrison, 529 U.S. at 608 ("The scope of the interstate commerce power must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.").

-19-

### 3. The Power to Prevent Criminal Conduct

The government argues that Congress's power to commit sexually dangerous individuals derives from its power to prevent the commission of criminal conduct, which in turn, derives from its power to criminalize that conduct in the first place, which power derives from powers enumerated by the Constitution, such as the Commerce Clause. (Gov't Br. at 7-9.) Citing United States v. Perry, 788 F.2d 100 (3rd Cir.), cert. denied, 479 U.S. 864 (1986), the government argues that "[w]here the Constitution invests Congress with the power to criminalize, it invests Congress with the power to prevent the commission of those crimes by persons in BoP or Attorney General custody where 'necessary and proper' to its authority to regulate persons in its custody and to criminalize the conduct." (Gov't Br. at 7; see also Trans. at 21-22, 25 (when Congress has the authority to criminalize conduct under the Commerce Clause, Congress also has the necessary and proper authority to prevent the future commission of those federal crimes).)[10] A careful examination of Perry, however, illuminates the narrowness and specificity of its relevant holding.

In Perry, the Third Circuit addressed the constitutionality of a presumption contained in the Bail Reform Act permitting pretrial detention of an arrestee when "no condition or

---

[10] In support of its argument that Congress has the power to provide for civil commitment of sexually dangerous persons, the government also cites Plotts, 347 F.3d at 878, as well as United States v. Blumberg, 136 F. Supp. 269, 271 (E.D. Pa. 1955); Ponzi v. Fessenden, 258 U.S. 254, 262-63 (1922); and United States v. Berrigan, 482 F.2d 171, 182 (3rd Cir. 1973), as examples of cases in which courts have "routinely upheld legislation aimed at preventing federal crimes by persons in federal custody and as preemptive means to aid in Congress's authority to criminalize conduct." (Gov't Br. at 9.) First, § 4248 is not a law aimed at preventing federal crimes by persons *in* federal custody; it is a law designed to prevent the commission of sexually violent conduct and child molestation generally, and it is designed to continue the confinement of certain individuals so they cannot commit crimes when released from federal custody. All of the foregoing cases cited by the government, in contrast, pertain to the control or regulation of individuals who are in one stage or another of federal custody as a result of a criminal charge or conviction. Second, as noted before, § 4248 is not a preemptive means to aid in Congress's authority to criminalize conduct because § 4248 is, according to the government, not a criminal law, and it does not criminalize conduct. The cases cited by the government are distinguishable.

combination of conditions will reasonably assure . . . the safety of the community" and where there is probable cause to believe that the accused has committed a major drug trafficking offense or a felony with a firearm. The court examined the source of federal power to detain arrestees without conviction (a type of civil commitment) for the safety of the community. <u>Perry</u>, 788 F.2d at 109.

> What, then, is the source of congressional authority to provide for civil commitment for "the safety of the community"? As the legislative voice of a government of limited powers, Congress, unlike the legislatures of the states, cannot sanction for the general welfare. . . . Congress may concern itself with the "safety of the community" only to the extent that other grants of specific power so permit.

<u>Id</u>.

In its analysis, the <u>Perry</u> court drew from the Supreme Court's <u>Greenwood</u> decision the principle that "the federal government may resort to civil commitment when such commitment is necessary and proper to the exercise of *some specific federal authority*. Congress may not, however, authorize commitment simply to protect the general welfare of the community at large." <u>Id.</u> at 110 (italics added).[11] The specific federal authority at issue in <u>Greenwood</u> was the "power to prosecute for federal offenses." <u>Greenwood</u>, 350 U.S. at 375. Recognizing that the federal interest at issue in <u>Greenwood</u> was not present in <u>Perry</u>, the <u>Perry</u> court examined the

---

[11] The court recognizes that the <u>Perry/Greenwood</u> principle does call into question the source of Congressional power to enact the civil commitment provision of 18 U.S.C. § 4246 as that statute pertains to prisoners whose sentences are getting ready to expire. Because § 4246 authorizes commitment of a prisoner suffering from a mental disease or defect "as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," the statutory language suggests an attempt to protect the general welfare of the community.

While the Supreme Court has held the commitment of incompetents who pose a danger to the interests of the United States to be within the scope of Congressional authority based on the unexhausted power to prosecute, see <u>Greenwood</u>, that analysis would not apply to the general commitment of mentally ill and dangerous prisoners whose sentences are about to expire. This court has not located a Supreme Court case specifically addressing the constitutionality of that provision. The constitutionality of § 4246, however, is not before this court.

source of Congressional authority to provide for civil commitment for "the safety of the community." Perry, 788 F.2d at 110. Applying the Greenwood principle, the Perry court wrote:

> A reasonable construction of this provision is that it is aimed at preventing the specific harm to the community proscribed by the four designated statutes; three dealing with drugs and one dealing with the use of firearms in the commission of federal offenses. We, therefore, read the second presumption of section 3142(e) as addressing *only* danger to the community from the likelihood that the defendant will, if released, commit one of the proscribed federal offenses. Thus because Congress has the power to proscribe the activities in question, it has the auxiliary authority, under the necessary and proper clause, to resort to civil commitment to prevent their occurrence.

Id. at 110-11 (emphasis added).

The pre-trial detention scheme in Perry is distinguishable in several ways from the commitment scheme at issue in § 4248. In Perry, the presumption of detention was triggered *only* for those individuals charged with serious violations of one of four federal drug and firearms statutes, and the statute was construed as one specifically "aimed at preventing the specific harm to the community proscribed by the four designated statutes." Id. at 111. The court explicitly based its holding that the provision in question was necessary and proper to the exercise of a specific federal authority on its conclusion that the statute "address[ed] *only* danger to the community from the *likelihood that the defendant will, if released, commit one of the proscribed federal offenses*." Id. (emphases added). Thus, in Perry, the court perceived an explicit federal interest, i.e., the prevention of specific federal crimes, and a distinct nexus between the federal crimes with which the individuals in Perry were charged and the presumption that those individuals would commit one of the enumerated federal crimes again if not committed.

Under § 4248, any federal prisoner is eligible for certification as a sexually dangerous person, regardless of the nature of his previous conviction, and any individual committed

-22-

pursuant to § 4241(d) is eligible, regardless of the nature of the charges against him. Section 4248 is, thus, far more broadly applicable than the provision of the Bail Reform Act at issue in Perry. Section § 4248 is not aimed at preventing a specific harm to the community proscribed by a set of enumerated federal laws. Unlike the provision of the Bail Reform Act at issue in Perry, section 4248 simply cannot be construed as a statute addressing *only* the danger to the community from the likelihood that the defendant will, if released, commit a proscribed federal offenses. It does not require a showing or employ a presumption that a prisoner or one incompetent to stand trial will, if not committed, commit *a proscribed federal offense,* or for that matter, any federal offense.

The government acknowledged at oral argument that Perry's necessary and proper holding "was tethered to the crimes for which the individual was held that would be committed in the future if the person was released. Because Congress had the Commerce Clause authority to criminalize certain federal drug offenses and federal drug crimes, the [Perry court] found that Congress also possesses the necessary and proper authority *to prevent the future commission of those crimes*." (Trans. at 34 (emphasis added).) Without elaborating upon the necessary leap of logic, the government argues that the fact that § 4248 "may thwart the commission of *purely* state law sex offenses *rather than federal crimes* is of no moment." (Br. at 11 (emphases added).) The government's reliance on Perry here is unpersuasive. While the statute at issue in Perry may have *also* thwarted the commission of some state law crimes, the Perry court specifically premised Congressional authority to enact the detention provision on the fact that the Act presumed that, absent detention, the charged individuals would commit one of several, enumerated, proscribed federal offenses.

-23-

The government concedes that § 4248 is aimed at preventing any or all of the sexually violent conduct ***underlying*** various federal sex crimes. It is precisely the purview of the states, however, to deal with the so-called "underlying conduct" – particularly if, by that language, the government means the sexually violent conduct stripped of the jurisdictional bases that typically enable Congressional criminalization and regulation. Section 4248, unlike the statute at issue in Perry, is a statute broadly designed to authorize commitment to protect the general welfare of the community, a power that the Perry court believed was not within the scope of Congressional authority.

A closer look at various federal sex offenses illuminates the disconnect between the federal government's limited authority to criminalize sexually violent conduct and § 4248's scheme permitting the certification and commitment of any federal prisoner who could be characterized as a sexually dangerous person. The federal government simply does not have broad power generally to criminalize sexually dangerous conduct and child molestation.[12]

> Since the Constitution does not delegate to Congress generally the right to enact criminal laws, every foray into the area of criminal law is an intrusion into the states' traditional dominion. However, when an activity is the source of a problem national in scope and substantially affects an area *over which Congress has power*, Congress is within its authority in determining that the balancing inherent in federalism weighs in favor of its regulating that activity. . . .
> A factor weighing heavily in favor of passing constitutional muster is a jurisdictional element in the criminal statute, that is, one which requires as an element of proof evidence that the activity is interstate in nature. . . .

United States v. Ganaposki, 930 F. Supp. 1076 (M.D. Pa. 1996) (citations omitted)(emphasis

---

[12] As Justice Marshall wrote in a dissent in Salerno, 481 U.S. at 759 n.4, "[p]reventing danger to the community through the enactment and enforcement of criminal laws is indeed a legitimate goal, but in our system the achievement of that goal is left primarily to the States. The Constitution does not contain an explicit delegation to the Federal Government of the power to define and administer the general criminal law."

added)(holding section 228 of Child Support Recovery Act valid under the Commerce Clause because willful failure to pay child support with respect to a child residing in another state has a substantial effect on interstate commerce). In other words, congressional enactment of the federal criminal laws is itself an exercise of power under the Necessary and Proper Clause. See, e.g., United States v. Patton, 451 F.3d 615, 618 (10th Cir. 2006) ("It may seem like common sense to prohibit felons' possession of bulletproof vests and other forms of body armor, which facilitate violent crime. Indeed, thirty-one states already do so. But the Constitution does not grant the federal government a police power or a general authority to combat violent crime. . . . The myriad provisions in the federal criminal code are justified, as a constitutional matter, only by reference to Congress's enumerated powers."), cert. denied, 127 S. Ct. 1247 (2007). Providing for civil commitment deemed necessary to effectuate the goals of federal criminal laws, which are themselves contingent on some other enumerated power, may be permissible, but the connections should be made clear.[13]

Federal sex crimes have, incorporated within them, specific jurisdictional elements. See, e.g., 18 U.S.C. §§ 2241-2245, 2251-2252 (addressing proscribed sexual conduct with children or others, or conduct exploitative of children, that occurs in the maritime or territorial jurisdiction of the United States, in federal prisons, or in interstate commerce). The power to criminalize certain circumscribed sexually violent behavior is not an "enumerated power" upon which to premise the civil commitment of any potentially sexually dangerous persons as a "necessary and proper" act.

---

[13] For example, "[t]he Supreme Court has . . . recognized that the Necessary and Proper Clause contained in Article I, § 8, ¶ 18 extends the reach of the Spending Clause to authorize federal criminal laws which 'keep a watchful eye on expenditures and on the reliability of those who use public money.' See Sabri v. United States, 541 U.S. 600 . . . (2004)." Daker v. Ferrero, 475 F. Supp. 2d 1325, 1342 n.9 (N.D. Ga. 2007).

-25-

Construing the necessary and proper clause in this way would allow Congress to take steps to "prevent" all kinds of conduct that it has no ability to criminalize in the first place.

If Congress is limited in criminalizing conduct and punishing that conduct when it occurs, Congress must be subject to those same limitations in any quest to prevent such criminal conduct from happening. The government is correct that incidental prevention of criminal conduct that violates state laws should not, in and of itself, invalidate a federal effort to prevent the commission of federal crimes. However, where there is absolutely no nexus between the findings required for commitment under § 4248 and the likelihood that any individual prisoner would commit a federal sex crime, and where the vast majority of sexually violent conduct and child sexual abuse is regulated by state law, and where the commitment of mentally disordered sexually violent individuals is traditionally handled by state governments, the federal government has created a situation in which its commitment efforts are likely to solely prevent the commission of state criminal conduct.

The court concludes that neither the Commerce Clause, the Necessary and Proper Clause, nor any other authority suggested, provide Congress with the power to enact § 4248 as it pertains to individuals previously committed under § 4241, to prisoners whose sentences are about to expire, or to people in federal custody against whom all criminal charges are dropped based on mental condition.

### B. Is § 4248 "Necessary" and "Proper"?

Assuming, for the sake of argument, that Congress had the power to enact § 4248, the court will examine whether § 4248 is a necessary and proper exercise of that power.

-26-

### 1. Necessary

The Supreme Court has held on several occasions that the Necessary and Proper Clause does not demand that an act of Congress be "absolutely necessary" to the exercise of an enumerated power. See, e.g., Jinks v. Richland County, S.C., 538 U.S. 456, 462 (2003). The Necessary and Proper Clause "enables Congress to enact laws, subject to other constitutional constraints, "'that bear a rational connection to any of its enumerated powers.'" Plotts, 347 F.3d at 878.

Even if Perry stands for the proposition that the federal government has the power or the authority under the Necessary and Proper Clause to detain or commit individuals in an attempt to prevent the conduct that it has the power to criminalize, a proposition that respondents dispute, § 4248 should not be characterized as a "necessary" means of carrying out that particular power because the statute is not, as explained above, rationally connected to the goal of preventing *federal* sex crimes. Finding that a person has engaged in the statutorily undefined "sexually violent conduct" or "child molestation" and that a person has a mental abnormality inclining him or her to sexual deviance or violence of one kind or another is simply not a reliable indication of the likelihood that (s)he will commit a *federal* crime, i.e., a type of criminal conduct that the federal government has the authority to regulate, and thus commitment of such a person cannot accurately be described as an action necessary to the execution of an enumerated federal power.

The court recognizes that the broad interpretation accorded to the term "necessary" historically gives Congress wide latitude in crafting federal laws to help carry out its enumerated powers. The "necessary" test simply is not a strenuous one. Necessary and proper are not synonymous, however.

-27-

## 2. "Proper" Laws – a Limitation of the Federal Government's License to Regulate

In M'Culloch, Justice Marshall emphasized that Congress could not "under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government." 17 U.S. at 423. The Supreme Court reiterated the limitations imposed by the Constitution upon the federal government in Morrison:

> With its careful enumeration of federal powers and explicit statement that all powers not granted to the federal government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate. . . . . Moreover, the principle that "'the Constitution created a Federal Government of limited powers,'" while reserving a generalized police power to the States, is deeply ingrained in our constitutional history.

Morrison, 529 U.S. at 618 n.8 (citations omitted). Justice Marshall's oft-quoted language from M'Culloch also requires any act taken pursuant to the Necessary and Proper Clause to be accomplished by means "which are appropriate," and which "consist with the letter and spirit of the constitution, . . . ." Id. Both requirements may allude to propriety.

"[A] 'proper' executory law must respect the system of enumerated federal powers: executory laws may not regulate or prohibit activities that fall outside the subject areas specifically enumerated in the Constitution." The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L. J. at 285. Both M'Culloch and the rationale underlying the Supreme Court's more recent Commerce Clause jurisprudence support the thesis offered by Lawson and Granger that the term "proper," as used in the Necessary and Proper Clause, functions as a substantive, jurisdictional limitation on Congressional power. Given the requirement that means chosen by Congress be "appropriate" and "consist[ent] with the letter and spirit of the Constitution" and taking into consideration both

-28-

the carefully delimited powers of the federal government and the powers traditionally reserved to

and exercised by the States, this court concludes that § 4248 is not a "proper" exercise of federal

power.

The Fourth Circuit has recognized that Congress may act pursuant to an enumerated or

cognizable incidental power, yet still fail to craft a statute that is a proper means of effectuating

its intent:

> Under the Supreme Court's interpretation of the [Tenth] amendment, we ask two questions to determine whether a statute violates it: First, whether the regulation it embodies is within Congress' raw power as being within those enumerated in the constitution. Second, whether, even if so, the means of regulation employed yet impermissibly infringe upon state sovereignty. New York v. United States, 505 U.S. 144, 159, 188, . . . (1992) (so concluding, in process of holding that while Congress had raw Commerce Clause power to regulate disposal of low level nuclear waste, means chosen, of effectively requiring states to regulate, impermissibly infringe on state sovereignty). See also ACORN v. Edwards, 81 F.3d 1387, 1393 (5th Cir. 1996) (same).

United States v. Johnson, 114 F.3d 476, 480 (4th Cir.), cert. denied, 522 U.S. 904 (1997).

The Tenth Amendment provides that the "powers not delegated to the United States by

the Constitution, nor prohibited by it to the States, are reserved to the States respectively . . . ."

U.S. Const., Amend. X. The interpretation and application of the Necessary and Proper Clause

must accord with the letter and spirit of the Tenth Amendment and the historical reservation of

certain defined powers to the states. In this case, the government has asserted Congress's power

to act pursuant to the Necessary and Proper Clause in two overlapping areas traditionally

governed by the states – the prohibition of sexually violent criminal conduct and the commitment

of and care for mentally ill individuals. See Raich, 545 U.S. at 42 ("The States' core police

powers have always included authority to define criminal law and to protect the health, safety,

and welfare of their citizens.")(O'Connor, J., dissenting); Morrison, 529 U.S. at 618 ("we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime"); O'Connor v. Donaldson, 422 U.S. 563, 582-83 (1975) ("There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society from the dangers of significant antisocial acts or communicable disease. . . . Additionally, the States are vested with the historic *parens patriae* power, including the duty to protect 'persons under legal disabilities to act for themselves.' . . . . The classic example of this role is when a State undertakes to act as 'the general guardian of all infants, idiots, and lunatics.'" (citations omitted)); United States v. Cohen, 733 F.2d 128, 133 (D.C. Cir. 1984) (same); United States v. Duhon, 104 F. Supp. 2d 663, 681 (W.D. La. 2000) (care and treatment of mentally ill and incompetent has historically been the province of the states).[14] This assertion of power, together with the government's acknowledgement at oral argument that the Tenth Amendment limits the necessary and proper

---

[14]  That the government created by the Federal Constitution is one of enumerated powers, and cannot, by any of its agencies, exercise an authority not granted by that instrument, either in express words or by necessary implication; that . . . a state of the Union may exercise all such governmental authority as is consistent with its own Constitution, and not in conflict with the Federal Constitution; that such a power in the state, generally referred to as its police power, is not granted by or derived from the Federal Constitution, but exists independently of it, by reason of its never having been surrendered by the state to the general government; that among the powers of the state, not surrendered, which power therefore remains with the state, is the power to so regulate the relative rights and duties of all within its jurisdiction as to guard the public morals, the public safety, and the public health, as well as to promote the public convenience and the common good; and that it is with the state to devise the means to be employed to such ends, taking care always that the means devised do not go beyond the necessities of the case, have some real or substantial relation to the objects to be accomplished, and are not inconsistent with its own Constitution or the Constitution of the United States.

House v. Mayes, 219 U.S. 270, 281-82 (1911).

-30-

power of Congress, (Trans. at 26), highlight the difficulties posed by § 4248's commitment scheme.[15]

The mere fact that a federal law displaces state action does not, in and of itself, signify Congressional overreaching. The Supreme Court has explicitly "upheld as constitutional any number of federal statutes enacted under the commerce power that pre-empt particular exercises of state police power." Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264 (1981). Thus, the Tenth Amendment does not prohibit Congress from displacing state laws enacted pursuant to state police power when Congress is acting pursuant to its Commerce Clause powers. As discussed previously, § 4248 was not enacted pursuant to Congress's Commerce Clause power or any other enumerated power. Statutes like § 4248, that purportedly are enacted pursuant to the Necessary and Proper Clause, yet are not obviously tied to an enumerated power, present a more complicated question. What might be "necessary" and certainly what might be "proper" to aid the federal government in the enforcement of criminal laws and its asserted power to prevent criminal conduct, particularly in this area not explicitly delegated to the federal government and historically reserved to the states, would logically be determined by reference to that reserved power. See Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 584-85 (1985) (O'Connor, J., dissenting, joined by Justices Powell and Rehnquist) (explaining that the underlying principle in numerous Supreme Court cases (cited therein) is consistent: "state autonomy is a relevant factor in assessing the means by which Congress exercises its

---

[15] The court notes that this discussion of the Tenth Amendment is not a consequence of any specific Tenth Amendment claim put forth by respondents. Indeed, respondents have not made such a claim and thus, no issue of standing to make such a claim is before this court. Rather, the court examines the Tenth Amendment because it necessarily limits operation of the necessary and proper powers of the government and because, as a constitutional provision, it is pertinent to the characterization of any act of Congress as necessary or proper.

Case 5:06-hc-02202-BR   Document 30   Filed 09/07/07   Page 31 of 59

powers"). In <u>New York</u> v. <u>United States</u>, 505 U.S. 144, 156 (1992), the Supreme Court wrote,

> [Q]uestions [as to whether particular sovereign powers have been granted by the
> Constitution to the Federal Government or have been retained by the States] can
> be viewed in either of two ways. In some cases, the Court has inquired whether an
> Act of Congress is authorized by one of the powers delegated to Congress in
> Article I of the Constitution. See, e.g., <u>Perez</u> v. <u>United States</u>, 402 U.S. 146, 91
> S.Ct. 1357, 28 L.Ed.2d 686 (1971); <u>McCulloch</u> v. <u>Maryland</u>, 4 Wheat. 316, 4
> L.Ed. 579 (1819). In other cases the Court has sought to determine whether an
> Act of Congress invades the province of state sovereignty reserved by the Tenth
> Amendment. See, e.g., <u>Garcia</u> v. <u>San Antonio Metropolitan Transit Authority</u>, 469
> U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); <u>Lane County</u> v. <u>Oregon</u>, 7
> Wall. 71, 19 L.Ed. 101 (1869). . . . This has been the Court's consistent
> understanding: "The States unquestionably do retai[n] a significant measure of
> sovereign authority . . . to the extent that the Constitution has not divested them of
> their original powers and transferred those powers to the Federal Government." . .
> . . )(citation omitted)).[16]

## A. Limited Federal Action Historically in the Area of Commitment

Among other important factors, Congress has, prior to the enactment of § 4248, expressed

an historical reluctance to overstep the bounds of federal authority in the area of civil

commitment legislation. This reluctance has been expressed in legislative history and in the texts

of various commitment statutes. Prior to 1984, Congress expressed doubt, on a number of

occasions, about its authority to provide for the federal commitment of individuals acquitted on

---

[16] In <u>Patton</u>, the Tenth Circuit referred to powers traditionally reserved to the states when considering a
challenge to a federal statute criminalizing possession of body armor, which it ultimately affirmed based on its
interpretation of the pre-*Lopez* precedent of <u>Scarborough</u> v. <u>United States</u>, 431 U.S. 563, 575 (1977).

> We do not mean to suggest that subjects of traditional state concern are immune from
> congressional regulation when they fall within Congress's Article I powers. Our constitutional
> federalism is based on a one-way enumeration: the question is whether a particular authority has
> been vested in Congress, not whether it falls within the reserved powers of the states, which are
> defined only negatively. But evidence regarding traditional divisions of power between the states
> and the federal government can help to show how the Constitution's enumerations have been
> interpreted over time.

<u>Patton</u>, 451 F.3d at 632 n.8.

the basis of insanity. In a 1983 D.C. Circuit case, then Judge Scalia reviewed the legislative

history pertaining to the enactment of civil commitment schemes for such individuals and Tenth

Amendment concerns:

> Congress has on a number of occasions considered providing for the commitment,
> nationwide, of federal defendants acquitted on grounds of insanity. . . . The most
> recent occasion brought forth a well considered analysis by the House Judiciary
> Committee of the major concern leading to rejection:
>
>> The Committee recognizes that the Federal government is one of
>> specifically enumerated powers. State governments, on the other
>> hand, may act in any given area unless specifically prohibited by
>> the Constitution. Commitment and treatment of the mentally ill has
>> traditionally been left to the states pursuant to their *parens patriae*
>> or general police power. The Federal government has no such
>> authority. Foote, *A Comment on Pre-Trial Commitment of
>> Criminal Defendants*, 108 U. Pa. L. Rev. 832 (1960). . . . [The
>> report then considers in detail whether Congress has the
>> constitutional authority to provide for a nationwide federal
>> commitment procedure, but draws no firm conclusion.]
>>  . . .
>>
>> In view of these considerations, the Committee believes that a
>> Federal procedure for the commitment of the dangerously mental
>> [*sic*] disturbed would constitute an inappropriate interference with
>> the balance of Federal and State powers. Moreover, such a
>> procedure could constitute a precedent for further Federal
>> involvement in the care of the mentally ill. Once the Federal
>> Government takes on the task of caring for the dangerously mental
>> [*sic*] ill that become involved in the Federal criminal system,
>> Congress would most likely be asked to expand the Federal role
>> even further. For example, legislation might be proposed allowing
>> the Federal Government to take over State mental health
>> institutions, or to accept the transfer of those incarcerated there,
>> when the State is allegedly not doing a satisfactory job. The
>> Committee thus believes that the care of the mentally ill is a task
>> that uniquely belongs within the *parens patriae* powers of the
>> States.
>
> H.R. Rep. No. 1396, 96th Cong., 2d Sess. 559, 561 (1980) (footnotes omitted).

-33-

United States v. Cohen, 733 F.2d 128, 137-38 (D.C. Cir. 1984) (bracketed material original).

Judge Scalia explained further that

> [t]he issue, of course, is whether such congressional action would run afoul of the Tenth Amendment, because legislative authority in the general field of lunacy is reserved to the states. That issue was raised, but not resolved by the Supreme Court's decision, in Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), which involved federal treatment of a defendant found not competent to stand trial on federal charges. The narrow basis on which the Court found such treatment permissible – i.e., not barred by the Tenth Amendment – was that until the federal charges had been disposed of, the individual was properly in the custody of the United States. Id. at 375, . . . . If that is the only permissible basis for federal action in this field, then once the criminal custody is terminated, which may occur at the moment the defendant is acquitted, see Note, *Federal Commitment of Defendants Found Not Guilty by Reason of Insanity-Proposed Legislation*, 52 Iowa L. Rev. 930 (1967), the constitutional underpinnings of federal treatment may also dissolve.

Id. at 137 n.15.[17]

Within months of the Cohen case, and despite the concerns expressed in the legislative history cited therein, Congress enacted the Insanity Defense Reform Act of 1984 (IDRA), 18 U.S.C. § 17 and 18 U.S.C. §§ 4241-4247, which permits the federal civil commitment of insanity acquittees. However, that legislation, which also provides for the civil commitment of prisoners who are mentally ill and dangerous prior to the expiration of their sentences, see 18 U.S.C. § 4246, is extremely deferential to the states. The commitment schemes enacted by Congress prior to § 4248 give preference to state custody and recognize the appropriate arena of state police and *parens patriae* power. In fact, Congress explicitly described the limited role of the federal

---

[17] Judge Scalia's comment suggests the constitutional relevance of legitimate federal custody to Congressional exercise of power over individuals in the federal prison system. While the Greenwood Court relied on the fact that the "petitioner came legally into the custody of the United States," Greenwood, 350 U.S. at 375, the Court did not rely on the fact of that custody as the basis of federal authority to act. Rather, the Greenwood Court relied upon the government's unexhausted power to prosecute federal offenses, and explained that the legislation authorizing such commitment in such circumstances involved an assertion of authority "auxiliary to incontestable national power." Id.

government with respect to civil commitment in the legislative history of IDRA.

> Section 4246 covers those circumstances where state authorities will not institute civil commitment proceedings against a hospitalized defendant whose federal sentence is about to expire or against whom all criminal charges have been dropped for reasons related to his mental condition and who is presently mentally ill. At such a point the responsibility for the care of insane persons is essentially a function of the states. *The committee intends that this section be used only in those rare circumstances where a person has no permanent residence or there are no state authorities willing to accept him for commitment.* If criminal charges are dropped for reasons other than the mental condition of the defendant, such as insufficient evidence, but the defendant was mentally ill, the Attorney General would release the defendant to state authorities.

S. Rep. 98-225, P. L. 98-473 (Aug. 4, 1983) (emphasis added). Courts have construed § 4246 consistently with this expression of Congressional intent. See United States v. Chairse, 18 F. Supp. 2d 1021, 1032 (D. Minn. 1998) ("Section § 4246(a) . . . provides that certification by the Attorney General stating that there are no suitable arrangements for state custody is required before commitment proceedings may commence. 18 U.S.C. § 4246(a); . . . The reason for such a requirement is that it fulfills Congress' intent that 18 U.S.C. § 4246 be 'used only in those rare circumstances where a person has no permanent residence or there are no State authorities willing to accept him for commitment.' . . . It is further noted that Congress' intent to limit the use of 18 U.S.C. § 4246 is due to the belief that care and treatment for the mentally ill is the function of the states rather than federal government. . . ." (Citations omitted)).

At oral argument, the government argued that whatever power or authority permitted Congress to enact § 4246 also permitted the enactment of § 4248, which contains a similar commitment scheme applicable to a more specific type of dangerousness. (Trans. at 38.)[18] A

---

[18] The comparison of § 4246 and § 4248 raises the question why § 4248 was necessary if civil commitment of mentally ill and dangerous individuals is already possible under § 4246. Many states have both general civil

(continued...)

-35-

comparison of § 4246 and § 4248 illustrates that § 4248 renders a much larger group of individuals eligible for federal commitment and identifies additional instances in which Congress incorporated deference to the states in its limited authorization of the civil commitment of mentally ill and dangerous individuals in § 4246. Section 4246 differs from § 4248 in three significant ways: 1) under § 4246, the federal government must attempt to secure state placement for custody and care in three specific contexts: *prior to certifying* any hospitalized federal prisoner for commitment, *immediately after* obtaining a commitment order, *and periodically for the duration of the person's commitment* after assuming responsibility for the committed individual; 2) the individual capable of certifying candidates for commitment under § 4246 is specifically identified as the "director of a facility in which a person is hospitalized;" and 3) the group of people eligible for commitment is far more circumscribed under § 4246. Each of these distinguishing factors highlights the very different purpose of § 4248; while § 4246 was designed to provide for the civil commitment of mentally ill and dangerous individuals in federal custody in the rare circumstance in which a person has no permanent residence or no state authority is willing to accept the person, § 4248 is designed broadly to identify and confine all purportedly

---

[18](...continued)

commitment laws and commitment laws specifically geared toward sexual predators. The legislative history and academic writing about these state statutes indicate that sexual predator statutes are often created where dangerous sexual predators are unlikely to be committed under the general commitment provisions, either because the mental disorders afflicting such persons, such as antisocial personality disorder, would not qualify as "mental illness" under the general statutes or because incarcerated sex offenders had not committed recent overt acts, which were often prerequisite to commitment under general statutes. In addition, general commitment statutes were often designed to provide short-term treatment to individuals with serious mental disorders so they could be returned to the community while sex offender commitment statutes were designed to provide potentially long-term control, care and treatment of sexual predators. See Marc W. Pearce, *Civilly Committing Criminals: An Analysis of the Expressive Function of Nebraska's "Dangerous Sex Offender" Commitment Procedure*, 85 Nebraska Law Review 575, 582 (2007) (discussing Washington's Community Protection Act, which provides for the commitment of sexual predators, Wash. Stat. §§ 71.09.010 *et seq.*); Kan. Stat Ann. § 59-29a01(1994) and Kan. Stat. Ann. § 59-29a01(1999) (setting forth legislative findings supporting enactment of sexually violent predator statute). This court has not located any legislative history suggesting that § 4246 is inadequate to civilly commit sexual predators.

sexually dangerous persons who happen to be in the federal system.

Like § 4246, § 4248 clearly contemplates states ultimately being given the opportunity to assume responsibility for the care and custody of any prisoners civilly committed thereunder. See 18 U.S.C. §§ 4246(d) and 4248(d). However, the states enter the commitment scheme at a significantly later point under § 4248 than under § 4246, compare 18 U.S.C. § 4248(a) with 18 U.S.C. § 4246(a), calling into question the federal government's dominant role in the regulation of this area more traditionally governed by the states.

Under § 4246, the director of a facility does not even file a certificate unless "suitable arrangements for state custody and care of the person are not available," see United States v. S.A., 129 F.3d 995, 1000 (8th Cir. 1997) ("By its own terms, section 4246 applies only in those unique situations where suitable arrangements for state care and custody are unavailable. As indicated above, to initiate commitment proceedings the director of the facility must certify that no suitable state arrangements are available."), cert. denied, 523 U.S. 1011 (1998), while under § 4248, certification as a sexually dangerous person, a hearing on that issue, *and* commitment all occur prior to *any* exploration of potential state custody and care. The § 4248 commitment proceedings are initiated by the federal government upon certification, and the statute merely instructs the Attorney General to make every effort to cause a state to assume responsibility for the custody care and treatment of the detainee *after commitment has been ordered.*

Moreover, under § 4246, even after assuming custody and care of a committed individual, "[t]he Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume responsibility for the person's custody, care and treatment." 18 U.S.C. § 4246(d). Despite the similarity of the rest of the language in § 4248(d), section 4248 does not

-37-

have a similar requirement. In other words, the government is not required by § 4248 to make any periodic efforts to return an individual committed as a sexually dangerous person to his or her own state for care.

In United States v. S.A., in response to a challenge by a juvenile to commitment under § 4246, the Eighth Circuit rejected the juvenile's argument that interpreting § 4246 to include commitment authority over federally adjudicated juveniles would infringe upon the rights of states to civilly commit mentally ill individuals. 129 F.3d at 1000. The court explicitly held that "the civil commitment authority of a state is not infringed by a commitment which occurs when state facilities are unavailable." Id. Section 4248's failure to incorporate deference to the states' police and *parens patriae* powers in the area of commitment is, given its textual similarity to § 4246, inexplicable, and, unlike the scheme set out in § 4246, authorizes a civil commitment scheme that impermissibly infringes upon the reserved powers of the states.

Section 4246 applies to federal prisoners whose sentences are about to expire, people who have been committed to the custody of the Attorney General pursuant to § 4241(d), and people against whom all criminal charges have been dismissed solely for reasons related to their mental condition **IF** those people have been hospitalized in a facility. Only the director of a facility in which a person is hospitalized may certify a person for commitment proceedings under § 4246. Thus, § 4246 contemplates the commitment of an individual that the BoP has transferred for evaluation or hospitalization and with respect to whom the BoP has taken on the obligation of treatment and care. While prisoners serving active sentences may be transferred voluntarily for evaluation, hospitalization, or treatment at the request of the BoP, any prisoner who objects to such a transfer is entitled to a hearing and a court order requiring such a transfer pursuant to §

-38-

4245. Thus, certification for commitment under § 4246 can only occur if the director of a facility *in which a person is hospitalized* certifies that 1) a person in one of the foregoing categories is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another AND 2) that suitable arrangements for state custody and care are not available.

Accordingly, the group of people eligible for commitment under § 4246 is far more circumscribed than the broad group covered by § 4248. Those eligible for commitment under § 4246 are those to whom the government has already taken on a certain responsibility and obligation by referring them for evaluation or committing them for treatment as mentally diseased or defective prisoners. Section 4246 allows the government to continue meeting its obligations of care for an individual who continues to suffer from mental illness and who is likely to continue to pose danger to others after the expiration of his sentence and to protect the safety and welfare of the community from the danger that could be posed by that individual if released. Importantly, although § 4246 allows for the commitment of individuals as to whom the government's power to prosecute has been exhausted, the federal government cannot even undertake certification unless suitable arrangements for state care and custody are unavailable.

As the Ninth Circuit wrote in <u>United States</u> v. <u>Sahhar</u>, 56 F.3d 1026, 1029-30 (9th Cir.), cert. denied, 516 U.S. 952 (1995), addressing the defendant's concerns about the scope of the federal commitment statute,

> It is a truism that "[t]he passage of . . . [§] 4246 was not intended to be an invasion of the general field of lunacy, which is reserved to the states." <u>United States</u> v. <u>Clark</u>, 617 F.2d 180, 184 n. 5 (9th Cir. 1990). As we said in <u>Sahhar I</u>, the states have the principal responsibility for committing dangerous persons:

-39-

> Unlike most states, the federal government has chosen not to establish a comprehensive system of civil commitment, reserving to local authorities the principal task of committing dangerous, mentally ill persons. *Section 4246 thus is narrowly tailored to apply only to a particular concern of the federal government: dangerous persons charged with federal crimes but found incompetent to stand trial.*

[United States v. Sahhar, 917 F.2d 1197, 1203 (9th Cir. 1990) (Sahhar I), cert. denied, 499 U.S. 963 (1991)] (citations omitted).

> Section 4246 does not authorize wholesale, continuous federal detention of dangerous persons who have once been charged with a federal crime. The statutory scheme embodies a clear preference that a state assume responsibility. . . . It is . . . clear that the statute's authorization for indefinite federal commitment is a conditional one, contingent upon whether a state has declined to accept custody of the federal detainee.[19]

In contrast, commitment under § 4248 is not conditional or contingent upon state availability or assumption of responsibility. Despite the fact that much of the language used in § 4248 was drawn verbatim from the text of § 4246, the provisions incorporating deference to the states and thus limiting the scope and purpose of the statute were omitted.

In spite of the demonstrably broader language, the government argues that § 4248 is narrowly tailored to apply only to a particular concern of the federal government: persons in federal custody who are serving or have served their respective criminal sentences for federal crimes, who have engaged in sexually violent conduct or child molestation and who, because of their mental condition or abnormality, are likely to engage in sexually violent conduct or child molestation. Throughout its argument, the government focuses exclusively on the propriety of the commitments that will be made under § 4248 and emphasizes the ostensibly narrow group of

---

[19] While section 4246 is not as limited as Sahhar I suggests because it also applies to prisoners whose sentences are about to expire, § 4246 limits the involvement of the federal government in all circumstances to the case in which a state will not assume responsibility, while § 4248 bestows broad powers of commitment upon the federal government without incorporating deference to state authorities.

-40-

individuals who may ultimately be committed under the statute as those "subject to the Act." (Trans. at 25.) However, the statute is so broadly applicable that the group of individuals actually subject to the Act (and the deprivations the Act entails, i.e., certification as sexually dangerous, psychiatric evaluation, delay of release from prison even if the prison sentence has been served in full[20]) is much larger than the group described by the government.

The very narrow group of people to whom § 4246 applies and the many restrictions within § 4246 recognizing the authority and reserved powers of state governments highlight the broad applicability, the breadth of purpose, and the extension of federal power represented by § 4248.

## B. Federal Custody as a Jurisdictional Limitation on Congressional Power

The government's assertion that § 4248 addresses a concern of the federal government is essentially premised on the fact that all individuals subject to commitment under § 4248 are in federal custody. While the government makes frequent references to the significance of legitimate federal custody, the government does not argue that the fact of custody provides the source of Congressional power to act under the Necessary and Proper Clause. Rather, the government suggests that legitimate custody is a condition upon which the exercise of that federal power is contingent. (Trans. at 35 ("Congress has the necessary and proper authority to enact legislation to ensure that conduct it has the power to criminalize is not committed in the future "particularly when and only when . . . the person is in federal custody so that the federal government has responsibility over that person's body.").) The government thus offers the fact

---

[20] For example, despite the fact that a prisoner may not ultimately be committed pursuant to § 4248, that prisoner may serve many months of additional imprisonment beyond his original sentence as a result of the government's decision to certify him as a sexually dangerous person.

-41-

of federal custody as a limiting principle setting jurisdictional boundaries on Congressional action and restraining the federal government from exercising a general police power: "It's the fact of custody that's significant because otherwise the Tenth Amendment would come in and suggest the federal government would not have, for instance, wholesale authority to haul away any individual off the street and commit them because that person would be dangerous." (Trans. at 28; see also id. at 26-7.) In other words, according to the government, the fact of custody renders § 4248 a "proper" exercise of federal power; "where the person is actually in federal custody so that the federal government legitimately has power and control over that individual, the federal government also has the responsibility to ensure that it does not release to the general public those persons who will pose a danger, commit sexually violent conduct and molest its children as has been clinically found by a psychologist or a psychiatrist." (Id. at 27.)

The government explains that the text of § 4248 underscores the importance of legitimate federal custody, citing § 4248(g),[21] which requires the government to release any sexually dangerous person against whom charges are dropped for reasons unrelated to the person's mental condition, as evidence of Congress's appreciation of the fact that the federal government may not act to commit an individual who is suffering from a mental abnormality and likely to engage in

---

[21]     If the director of the facility in which a person is hospitalized or placed pursuant to this chapter certifies to the Attorney General that a person, against whom all charges have been dismissed *for reasons not related to the mental condition of the person*, is a sexually dangerous person, the Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried for the purpose of institution of State proceedings for civil commitment. If neither such State will assume such responsibility, the Attorney General shall release the person upon receipt of notice from the State that it will not assume such responsibility, but not later than 10 days after certification by the director of the facility.

18 U.S.C. 4248(g) (emphasis added). See also 18 U.S.C. § 4246(g) (same).

sexually violent behavior if that individual is not "legitimately" in the custody of the BoP. (See

Trans. at 32.) It is difficult to discern the difference, however, between the situation of a

purportedly sexually dangerous individual legitimately in federal custody pursuant to § 4241 who

is subsequently released because the charges against him were dropped for lack of evidence, on

the one hand, and that of a purportedly sexually dangerous individual who has served time for his

conviction in full, on the other. In both cases, when the charges are dropped (for reasons

unrelated to mental condition) and when the sentence expires (for reasons unrelated to mental

condition), the individual is no longer legitimately in federal custody. Under § 4248(g), the

government can certify a § 4241 committee as sexually dangerous while he is legitimately in

federal custody, but must release that person if the charges are dropped for reasons other than

mental illness. Logically, to be consistent with the theory underlying § 4248(g), it would follow

that the government could certify a prisoner as a sexually dangerous individual while the prisoner

was serving time but, upon the expiration of his sentence, i.e., the end-point of legitimate federal

custody, the government would be required to release the individual. In both cases, the continued

exercise of federal custody over the individual at issue would appear to be equally improper.

In support of its argument regarding the significance of federal custody, the government

emphasizes respondents' concession that decisions about how to control federal prisoners are

within the undisputed authority of the federal government and notes that when certification is

made under § 4248, the prisoner in question is, at that time, in federal custody: "the reason again

that federal custody is significant is because . . . the federal government has no doubt the

legitimate regulatory goal of preventing danger to the community and . . . the government's

interest in preventing crime by arrestees is both legitimate and compelling." (Trans. at 36-37.)

-43-

At another point, the government argues: "Where, as here, Congress has the power to criminalize and punish such conduct . . .it has the necessary and proper authority to prevent their imminent or likely commission by persons *in federal custody*." (Brief at 10 (emphasis added).)

First, as discussed previously, the federal government does not have the authority to prevent generalized danger to the community. See Perry, 788 F.2d at 109 ("Congress . . . cannot sanction for the general welfare. . . . Congress may concern itself with the 'safety of the community' only to the extent that other specific grants of power so permit."). Second, preventing a prisoner from engaging in certain conduct while he is in federal custody serving a federal sentence or on federal supervised release is a different thing all together from preventing a person who is a federal prisoner from possibly engaging in certain conduct in the future after the expiration of his sentence that Congress does not have the authority to regulate. The fact of legitimate custody might be a sufficient basis for the exercise of control over an individual's conduct during the period of custody (including a period of supervised release) – but it does not establish Congressional authority to provide for the commitment of a person *after* a person has completed a sentence for a federal crime, i.e., when the power to prosecute federal offenses is exhausted, when that person has not committed any misconduct while in custody, and where there has been no showing that the person is likely to engage in conduct that Congress, as opposed to the states, actually has the authority to criminalize. The fact of federal custody, standing alone, shorn of the power to prosecute that was the linchpin of the Greenwood decision, does not render the § 4248 commitment scheme a "proper" exercise of Congressional power.

In sum, section § 4248 unnecessarily and improperly deprives the states of *parens patriae* and police powers and impermissibly intrudes upon an area historically regulated by the states.

-44-

The broad scope of the statute and the failure to incorporate deference to the state police and *parens patriae* powers that have been recognized in other federal commitment schemes require the conclusion that § 4248 is not an appropriate means nor a means consistent with the letter and spirit of the Constitution of achieving a legitimate goal of the federal government and thus is unconstitutional.

### III. The Clear and Convincing Standard of Proof as a Violation of Due Process

Section 4248 requires a court to find by clear and convincing evidence that an individual has engaged in sexually violent conduct or child molestation as a prerequisite to commitment. Respondents contend that the clear and convincing burden of proof is constitutionally inadequate in this context.

A standard of proof functions to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." In re Winship, 397 U.S. 358, 370 (1970). "In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.'" Addington v. Texas, 441 U.S. 418, 426 (1979) (citation omitted). The Supreme Court has repeatedly recognized "that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Id. Moreover, Supreme Court precedent teaches that due process "is flexible and calls for such procedural protections as the particular situation demands." United States v. Jones, 463 U.S. 354, 367-68 (1983). Regardless of whether the commitment proceedings governed by § 4248 are accurately characterized as civil, the pertinent analyses in In re Winship and Jones indicate that the reasonable doubt standard should apply to the factual determination that an individual sought

-45-

to be committed engaged or attempted to engage in sexually violent conduct or child molestation, which determination is a condition precedent to commitment under § 4248.

Failure to apply the reasonable doubt standard to such an antecedent factual finding required for commitment under § 4248 constitutes a denial of due process in this case as surely as it did in Winship. There, the Supreme Court reviewed a statute permitting a determination of juvenile delinquency and subsequent confinement based on a factual determination that the minor in question had engaged in conduct that would be considered criminal if the minor were an adult. The Court held that, given the liberty interests at stake, any such factual finding must satisfy the reasonable doubt standard even though the proceedings were civil and not criminal in nature. Winship, 397 U.S. at 366. The Winship Court recognized that "the basic issue – whether the individual in fact committed a criminal act – was the same in both [criminal and delinquency] proceedings. There being no meaningful distinctions between the two proceedings, we required the state to prove the juvenile's act and intent beyond a reasonable doubt." Addington, 441 U.S. at 427-28. Winship thus supports the proposition that where factual findings of criminal acts must precede the taking of an individual's liberty, those findings must be made beyond a reasonable doubt.

The government argues that, in the context of a § 4248 civil commitment proceeding, the clear and convincing burden of proof properly allocates the risk of an erroneous commitment between the parties, and that post-deprivation proceedings exist to cure any erroneous commitment. (Gov't Br. at 22-24.) As Justice Harlan noted in his concurring opinion in Winship, however, the complete loss of personal liberty through state-imposed confinement and the delinquency determination that stigmatizes the individual at issue are similar to the

-46-

consequences that follow from a criminal conviction, and the gravity of the potential costs to the

individual as a result of factual error demand the application of the reasonable doubt standard.

397 U.S. at 373-74. The Winship majority shared Justice Harlan's concerns: "We made clear [in

Application of Gault, 387 U.S. 1, 36 (1967),] that civil labels and good intentions do not

themselves obviate the need for criminal due process safeguards in juvenile courts, for "(a)

proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to

the loss of his liberty for years is comparable in seriousness to a felony prosecution." Winship,

397 U.S. at 365-66. Similarly, here, despite the designated "civil" nature of the proceedings, the

complete loss of personal liberty for a potentially indefinite time period through federally-

imposed confinement and the undeniable stigma associated with being labeled a "sexually

dangerous person," which surely equals or exceeds any stigma associated with juvenile

delinquency, demand that a committing judge be convinced beyond a reasonable doubt that the

individual committed some act on which the label and the indefinite confinement are premised.[22]

　　　State courts asked to determine the appropriate standard of proof to apply in various state

sex offender commitment statutes have relied on Winship to conclude that the reasonable doubt

standard is required. In a post-Addington decision, the Washington Supreme Court concluded

that the reasonable doubt standard should be applied to sexual psychopathy commitment

proceedings, regardless of whether the proceeding was labeled criminal or civil, explaining that

"'[t]he analogy to Winship is clear and persuasive, sufficient alone to warrant the [application of

the reasonable doubt standard].' *Due Process Requires Proof Beyond Reasonable Doubt for*

---

[22] As in Winship, the fact that criminal consequences do not attach to the finding of criminal conduct does
not lessen the seriousness and importance of the consequences of civil commitment. See Winship, 397 U.S. at 373-
74 (Harlan, J., concurring).

-47-

*Commitment of Sex Offenders*, 1975 Wash. U.L.Q. 1092, 1102 (1976)." Washington v. Rinaldo,

655 P.2d 1141, 1145 (Wash. 1982). See also United States ex rel. Stachulak v. Coughlin, 520

F.2d 931 (7th Cir. 1975) (in absence of explicit statutory direction, relying on Winship to hold

that due process requires that the reasonable doubt standard be applied in proceedings under the

Illinois Sexually Dangerous Persons Act), cert. denied, 424 U.S. 947 (1976); People v. Burnick,

535 P.2d 352 (Cal. 1975) (with respect to now-repealed Mentally Disordered Sexual Offender

law, due process required proof beyond a reasonable doubt in proceedings that led to the

involuntary commitment of persons found to be sexual psychopaths regardless of "civil" nature

of proceedings).

The Coughlin court's conclusion that the reasonable doubt standard be applied to findings

that an individual is a sexually dangerous person under the Illinois statute was not based on a

general conclusion that the statute was "criminal" in nature. Rather, despite the fact that the

statute was presented as one permitting civil commitment of sexually violent individuals, the

court concluded that the consequences of commitment, more substantial than those at issue in

Winship, required the application of the reasonable doubt standard.

> Here, the loss of liberty is as great, if not greater, than the loss in Winship. The
> violator of the criminal law be he an adult or juvenile is imprisoned, if at all, in
> almost all cases for a definite term. The person found to be sexually dangerous, in
> stark contrast, is committed for an indeterminate period and is unable to attain his
> freedom until he can prove that he is no longer sexually dangerous. Likewise with
> respect to stigma an involuntary commitment for sexual dangerousness presents
> an *a fortiori* case: Unlike the delinquency proceedings in Winship, these actions
> are not confidential, and an adjudication of sexual dangerousness is certainly more
> damning than a finding of juvenile delinquency.

Coughlin, 520 F.2d at 935-36. The Coughlin court acknowledged that lower courts had

previously held the need for mental treatment in civil commitment proceedings under the Illinois

-48-

Mental Health Code need only be proved by clear and convincing evidence. The court did not find the use of the clear and convincing standard in general commitment proceedings determinative of the appropriate standard in sex offender commitment proceedings.

The government argues, however, that Addington, an involuntary civil commitment case, provides the more analogous context. In Addington, the Court weighed the individual's interest in not being involuntarily confined erroneously against the state's interest in committing the emotionally disturbed person for his own welfare and the protection of the community. That Court rejected the argument, made in reliance on Winship, that the reasonable doubt standard should apply to a civil commitment determination, 441 U.S. at 431, instead holding that the clear and convincing standard of proof, at a minimum, would satisfy due process in a civil proceeding brought under state law to involuntarily commit an individual to a state mental hospital for an indefinite period of time, id. at 433. The Addington Court devoted a significant portion of its discussion to the nature of the issue before the court in a general civil commitment proceeding under the Texas statute: whether the individual sought to be involuntarily committed was mentally ill and required hospitalization for his own welfare and for the protection of others.

> There may be factual issues to resolve in a commitment proceeding, but the
> factual aspects present only the beginning of the inquiry. Whether the individual
> is mentally ill and dangerous to either himself or others and is in need of confined
> therapy turns on the meaning of the facts which must be interpreted by expert
> psychiatrists and psychologists. Given the lack of certainty and the fallibility of
> psychiatric diagnosis, there is a serious question as to whether a state could ever
> prove beyond a reasonable doubt that an individual is both mentally ill and likely
> to be dangerous. . . . The subtleties and nuances of psychiatric diagnosis render
> certainties virtually beyond reach in most situations. The reasonable-doubt
> standard of criminal law functions in its realm because there the standard is
> addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a
> large extent based on medical "impressions" drawn from subjective analysis and
> filtered through the experience of the diagnostician.

-49-

Id. at 429-30. The Court relied on the uncertainties of psychiatric diagnoses and predictions of future dangerousness as the bases for its conclusion that requiring proof beyond a reasonable doubt "may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." Id. at 432.[23]

The substance of the Addington holding addresses only the difficulties that would be posed by the second prong of the § 4248 test – whether an individual is "sexually dangerous to others," i.e., whether the individual "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). It is this second prong of the

---

[23] Hollis v. Smith, 571 F.2d 685, 695 (2nd Cir. 1978), cited by the government, held the clear and convincing burden of proof constitutional when reviewing New York's sex offender statute where the questions before the court, like those relevant to Texas's general civil commitment statute at issue in Addington, concern "a person's character and the prospects for his future conduct, . . . To require proof of such elements beyond a reasonable doubt would either prevent the application of such statutes except in the most extreme cases or invite hypocrisy on the part of judges or juries." The New York statute, unlike § 4248, did not require a specific finding of criminal conduct as a prerequisite to commitment. Rather, the petitioner in that case was eligible for the criminal sentence of one day to life as a result of pleading guilty to a specific sexual offense. New York law provided that:

any person convicted of assault in the second degree for an assault upon another with intent to commit the felony of rape in the first degree, rape in the second degree, sodomy in the first degree, sodomy in the second degree or carnal abuse may be punished by imprisonment for an indeterminate term, the minimum of which shall be one day and the maximum of which shall be the duration of his natural life.

Hollis, 571 F.2d at 687 (citing former section 243 of the New York Penal Law). Under that statutory scheme, the candidate for the indefinite sentence had already been found to have engaged in sexual violence beyond a reasonable doubt.

Likewise, while the government is correct that a federal district court in New Jersey recently approved that state's application of the clear and convincing evidence standard to commitments made pursuant to the New Jersey sex offender commitment statute, New Jersey Sexually Violent Predator Act, N.J.S.A. § 30:4-27.24 et seq., see Rivera v. Rogers, No. 05-3385, 2006 WL 3399427, *12 (D.N.J. Nov. 20, 2006), no one is eligible for commitment under that statute unless he or she "has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense [enumerated in the statute], or has been charged with a sexually violent offense but found to be incompetent to stand trial," N.J.S.A. § 30:4-27.26. Accordingly, the New Jersey courts apply the clear and convincing standard of proof only to determine whether a person "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." Id.

-50-

§ 4248 test that involves the psychiatric or psychological analysis that purportedly eludes the level of certainty required by the reasonable doubt standard. Here, as in Addington, there is a serious question as to whether the federal government could ever prove beyond a reasonable doubt that an individual is both suffering from a mental illness or abnormality such as pedophilia and unlikely to refrain from sexually violent conduct in the future as a result of that illness. Application of the clear and convincing standard to this second prong of the § 4248 test satisfies Addington without offending Winship and thus does not violate due process.[24]

However, the preliminary finding required by the first prong of § 4248 – that someone is a "sexually dangerous person" – poses an explicit factual question answerable only with specific, potentially knowable facts, because it requires the court to find that "a person has engaged or attempted to engage in sexually violent conduct or child molestation[,]" 18 U.S.C. § 4247(a)(5). This inquiry is not subject to the subtleties, the nuances, and the fallibility of psychiatric diagnoses that concerned the Addington Court and provided the basis for its holding. Either a person has engaged in such conduct, or he has not. Applying a reasonable doubt standard to the purely factual finding that must precede commitment under § 4248 would not impose a burden that the federal government could not meet or that would disable or render less

_____

[24] It is worthy of note that the statutes governing delinquency proceedings in New York at issue in Winship currently provide that "[a]ny determination at the conclusion of a fact-finding hearing that a respondent did an act or acts must be based on proof beyond a reasonable doubt," N.Y. Fam. Ct. Act § 744, but that an adjudication made at the close of a dispositional hearing may be based on a preponderance of the evidence, N.Y. Fam. Ct. Act § 745. See Matter of Kevin J., 438 N.Y.S.2d 681, 684 (N.Y. Fam. Ct. 1981) (dispositional hearing is analogous to sentencing in adult criminal case and its purpose is to provide assistance to court in evaluating all alternatives relevant to the disposition). See also Matter of Luis R., 414 N.Y.S.2d 997, 998 (N.Y. Fam. Ct. 1979) ("The delinquency hearing is a bifurcated affair, divided into a fact-finding stage and a dispositional stage, . . . It is at the fact-finding stage that the court determines by evidence beyond a reasonable doubt, whether the petition's allegations have been sustained. . . . At the dispositional hearing, the issues of treatment, confinement and supervision, or dismissal of the petition are considered. . . . " (citations omitted)).

effective the commitment scheme. Nor would it erect an unreasonable barrier to needed medical treatment for sex offenders. Rather, it would enhance the reliability of the fact-finding determinations and thus the commitment decisions made by courts at the behest of the BoP.

Civil commitment under the Texas statute at issue in Addington was not premised upon a finding of criminal conduct of any kind. Thus, the Addington Court's observation regarding the Texas statute that "[u]nlike the delinquency proceeding in Winship, a civil commitment proceeding can in no sense be equated to a criminal prosecution," is not particularly pertinent to a discussion of commitment under § 4248, which explicitly requires a finding of criminal conduct prior to commitment. Importantly, this antecedent finding is not simply a gratuitous inquiry, it is a finding of criminal conduct, albeit without criminal consequences, that is an absolute prerequisite to civil commitment under § 4248 and, as such, brings the § 4248 civil commitment scheme squarely within the ambit of the Winship rationale.

This antecedent finding of fact takes on even greater importance when one considers the commitment scheme as a whole and the criteria for eligibility for commitment. Any person in the custody of the BoP, any person who has been committed pursuant to § 4241(d), and any person against whom charges have been dismissed solely for reasons pertaining to the mental condition of the person, is eligible for commitment under this statute, regardless of the nature of his criminal history or the charges against him. A criminal history of sexual violence or molestation is not required; for example, individuals convicted of and serving time for bank robbery, mail fraud, tax evasion, drug dealing, and sexual abuse of a child in the special maritime or territorial jurisdiction of the United States are all equally subject to certification and

-52-

commitment under § 4248. Application of the reasonable doubt standard [25] to the antecedent

factual finding would more properly guard against the erroneous commitment of a person who

---

[25] In its brief, the government asserts that nine states of 18 with sexually violent predator commitment statutes have legislatively or judicially adopted the clear and convincing standard for state commitment schemes. At least four of the state statutes cited by the government, however, apply only to individuals convicted of or charged with sexually violent behavior (Florida, Missouri, New Jersey, and Virginia). See Florida (F.S.A. § 394.912(10(a))("sexually violent predator" is a person who "has been convicted of a sexually violent offense")); Missouri (Mo. Stat. § 632.480 defining "sexually violent predator" as person who "has pled guilty or been found guilty or been found not guilty by reason of mental disease or defect . . . of a sexually violent offense" or has been committed as criminal sexual psychopath before August 1980); New Jersey (N.J.S.A. § 30:4-27.26 (defining "sexually violent predator" as, inter alia, a "person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial"); Va. Code § 37.2-900 ("Sexually violent predator" means any person who "has been convicted of a sexually violent offense or has been charged with a sexually violent offense and is unrestorably incompetent to stand trial"). Nebraska (not cited by the government) also has a Sex Offender Commitment Act that uses a clear and convincing standard, but that statute also defines a "dangerous sex offender" eligible for commitment as one who "(a) . . . suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior or (b) a person with a personality disorder which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his or her criminal behavior." Neb. Rev. Stat. §§ 71-1201 *et. seq.*, and Neb. Rev. Stat. § 83-174.01.

Moreover, ten additional states have legislatively or judicially adopted the reasonable doubt standard and also render individuals eligible for commitment only if they have been charged with or convicted of a sexual offense. (Arizona, California, Illinois, Iowa, Kansas, Massachusetts, South Carolina, Texas, Washington, Wisconsin). See Ariz. Rev. Stat. § 36-3701(7)(a) (requiring that a "sexually violent person" have been, inter alia, "convicted of or found guilty but insane of a sexually violent offense" or charged with such a crime or found incompetent to stand trial for such a crime); Cal. Welf. & Inst. Code § 6600(a)(1) (requiring that a "sexually violent predator" have, inter alia, "been convicted of a sexually violent offense against one or more victims"); 725 Ill. Comp. Stat. § 207/5(f) (requiring that a "sexually violent person" have, inter alia, "been convicted of a sexually violent offense," adjudicated delinquent for such an offense or found not guilt of such an offense by reason of insanity); Iowa Stat. § 229A.2(11) (requiring that a "sexually violent predator" have been, inter alia, "convicted of or charged with a sexually violent offense"); Kan. Stat. Ann. § 59-29a02(a) (requiring that a "sexually violent predator" have been, inter alia, "convicted of or charged with a sexually violent offense"); Mass. Gen. Laws Ann. 123A § 1 (requiring that a "sexually dangerous person" have been, inter alia, "convicted . . . of a sexual offense," adjudicated delinquent by reason of such an offense or found incompetent to stand trial for such an offense); S.C. Stat. Ann. § 44-48-30 (requiring that a "sexually violent predator" have been, inter alia,"convicted of a sexually violent offense"); Tex. Health & Safety Code § 841.003 (requiring that a "sexually violent predator" be a "repeat sexually violent offender" which is a person who has been, inter alia, "convicted of more than one sexually violent offense"); Wash. Stat. § 71.09.020(16) (requiring that a "sexually violent predator" have been, inter alia, "convicted of or charged with a crime of sexual violence"); Wis. Stat. § 980.01(7) (requiring that a "sexually violent person" have been, inter alia, "convicted of a "sexually violent offense").

While some of the states above allow commitment based on charges of sexually violent offenses where the individuals charged are found not guilty by reason of insanity or incompetent to stand trial, those states require that the person be found sexually dangerous beyond a reasonable doubt, as is the case in Kansas. Ariz. Rev. Stat. § 36-3707; Cal. Welf. & Inst. Code § 6604; 725 Ill. Comp. Stat. § 207/35(d); Iowa Stat. § 229A.7; Kan Stat. Ann. § 59-20a07; Mass. Gen. Laws Ch. 123A § 15; S.C. Stat. § 44-48-100; Tex. Health & Safety Code § 841.062; Wash. Stat. § 71.09.060; Wis. Stat. § 980.05.

had never engaged in sexually violent conduct or child molestation.

As the Supreme Court explained in <u>Jones</u>, 463 U.S. at 367-68, "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'" <u>Id</u>. (citation omitted).[26] The <u>Jones</u> Court's analysis suggests that the same standard of proof is not necessarily applicable to all civil commitment proceedings, but rather that the requirements of due process vary with the circumstances posed by the class of potential candidates for commitment. In <u>Jones</u>, the Supreme Court upheld the use of the preponderance of the evidence standard used in the District of Columbia's scheme of commitment for insanity acquittees, explaining that the "concerns critical to [its] decision in <u>Addington</u> [were] diminished or absent in the case of insanity acquittees." 463 U.S. at 367. Rejecting the petitioner's invocation of <u>Addington</u>, the <u>Jones</u> Court wrote that the equation of the two situations ignored "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." <u>Id</u>.[27] In particular, the <u>Jones</u> Court noted that the risk of error, i.e.,

---

[26] With respect to flexibility, even the <u>Addington</u> Court, which held the clear and convincing burden to be the minimum required by due process in the commitment context, recognized that a heightened "clear, unequivocal and convincing" standard was appropriate in cases involving severe consequences similar to loss of liberty and factual issues susceptible of objective proof:

> In <u>Woodby</u> v. <u>INS</u>, 385 U.S. 276 . . . (1966), dealing with deportation, and <u>Schneiderman</u> v. <u>United States</u>, 320 U.S. 118, 125, 159 . . . , dealing with denaturalization, the Court held that "clear, unequivocal, and convincing" evidence was the appropriate standard of proof. The term "unequivocal," taken by itself, means proof that admits of no doubt, a burden approximating, if not exceeding, that used in criminal cases. *The issues in Schneiderman and Woodby were basically factual and therefore susceptible of objective proof and the consequences to the individual were unusually drastic - loss of citizenship and expulsion from the United States.*

441 U.S. at 432 (emphasis added).

[27] The Supreme Court explained that its holding in <u>Jones</u> was in accord "with the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." <u>Jones</u>, 463 U.S. at 370. Like insanity acquittees, sexually dangerous persons are a special class of people with respect to whom numerous states and now, the federal government, have taken steps to deal discretely, (continued...)

-54-

Case 5:06-hc-02202-BR    Document 30    Filed 09/07/07    Page 54 of 59

committing an individual who was not actually mentally ill and dangerous, was greater under the scheme at issue in <u>Addington</u> than that at issue in <u>Jones</u>, and that the individual should not be required to bear that risk equally with society. In contrast, the insanity acquittee himself proves that the criminal act he committed was a product of his own mental illness. Similarly, the commitment in <u>Addington</u> imposed a greater stigma than the stigma created by commitment in <u>Jones</u>, which the Court described as insubstantial given the stigma of the insanity verdict itself.

Just as the <u>Addington</u> concerns were diminished in <u>Jones</u>, those concerns are exacerbated in the § 4248 context, and due process in this particular situation demands application of the reasonable doubt standard to the antecedent factual finding mandatory for commitment as a sexually dangerous person. Given the class of potential candidates for commitment, i.e., all federal prisoners regardless of their criminal backgrounds,[28] and the intent of the statute to prevent sexually dangerous persons from engaging in further sexually dangerous conduct, there should be no reasonable doubt that those committed under § 4248 have actually engaged or attempted to engage in at least one previous act of sexual violence or child molestation. As noted above, reducing the risk of error in these proceedings would not compromise the government's interests in the least. The stigma associated with being identified and committed as a sexually dangerous mentally ill individual is far greater than either the general mental illness at issue in <u>Addington</u> or the residual stigma attached to commitment following an insanity acquittee's successful invocation of the insanity defense. Accordingly, the reasoning adopted by the

---

[27](...continued)
separate and apart from other candidates for commitment premised on generic mental illnesses.

[28] "[I]t is estimated that rape and sexual assault offenders account for . . . about 1% of those serving time in Federal prisons." Sex Offenders and Offenses, at 16-17 (Bureau of Justice Statistics rev. 2/6/1997).

-55-

Supreme Court in <u>Jones</u> suggests strongly that application of the reasonable doubt standard to the antecedent factual finding required under § 4248 would be consistent with the Supreme Court's civil commitment jurisprudence, which has analyzed the due process protections necessary in differing circumstances and approved the application of different burdens of proof according to those circumstances.

To the extent that the government relies on the Supreme Court's decision in <u>Kansas</u> v. <u>Hendricks,</u> in support of its assertion that § 4248 does not violate due process, the argument is unavailing. While the government is correct that the <u>Hendricks</u> decision upheld a statute permitting civil commitment of sex offenders based on evidence of past sexually violent behavior combined with some additional factor such as mental illness or mental abnormality, the actual holding of <u>Hendricks</u> was limited. In response to the specific issue raised by the parties, the Court concluded that a statue requiring a finding of "mental abnormality" as opposed to a "mental illness" satisfied substantive due process requirements for commitment. In the course of its discussion, the Court reiterated its previous holdings: "[w]e have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards." <u>Hendricks,</u> 521 U.S. at 358. The Court did not opine further in the <u>Hendricks</u> case on what exactly constituted proper procedures or proper evidentiary standards.

According to the government, § 4248 requires "some evidence of past sexually violent behavior," mental abnormality, and likelihood of dangerousness, and thus satisfies the standard set by the <u>Hendricks</u> decision. (Gov't Br. at 15.) It is worthy of note, however, that the <u>Hendricks</u> Court found that the KSVPA

-56-

> unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement. Commitment proceedings can be initiated only when a person 'has been convicted of or charged with a sexually violent offense' and 'suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.' . . . The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior . . . . As we have recognized, '[p]revious instances of past sexually violent behavior are an important indicator of future violent tendencies.'"

54 U.S. at 357-58. The charges and convictions that qualify as sexually violent offenses are expressly enumerated by the Kansas statute. In the case of a conviction, the past conduct already would have been proven beyond a reasonable doubt. Moreover, in the case of convicts, and in the case of charges that were not pursued as a result of incompetence or dropped due to the mental condition of the individual, and in the case of individuals found not guilty by reason of insanity, the Kansas statute provides for a trial during which the state must prove beyond a reasonable doubt that the individual in question is a sexually violent predator. See Hendricks, 521 U.S. at 352-53 (after the filing of a petition, a finding of probable cause to support a finding that an individual is a sexually dangerous person, a transfer to a secure facility and an evaluation, "a trial would be held to determine beyond a reasonable doubt whether the individual was a sexually violent predator"). Accordingly, the "evidence" required by the Kansas statute, which was upheld by the Supreme Court as one comporting with due process, provided far greater procedural protections for the individuals sought to be committed and far more reliable factual underpinnings for commitment decisions than available currently under § 4248 and, more specifically, committed only those who were found beyond a reasonable doubt to be sexually violent predators. Hendricks, therefore, cannot be used to support an argument that clear and convincing evidence of criminal conduct is constitutionally sufficient.

-57-

For the foregoing reasons, § 4248's failure to require a court to find beyond a reasonable doubt that a person has engaged or attempted to engage in sexually violent conduct or child molestation prior to permitting the individual's indefinite involuntary civil commitment as a sexually dangerous person constitutes a violation of due process.

## Conclusion

Because the civil commitment scheme set forth at 18 U.S.C. § 4248 is not sufficiently tied to the exercise of any enumerated or otherwise identifiable constitutional power of Congress and because § 4248, as currently structured, is not a proper exercise of any power that Congress might constitutionally exercise, this court concludes that 18 U.S.C. § 4248 is unconstitutional. In addition, commitment pursuant to § 4248, as written, would constitute a violation of due process because such commitment, which is contingent upon a factual finding that an individual engaged in specific criminal conduct, is permitted based on a proof of such conduct by clear and convincing evidence. Application of the reasonable doubt standard to the factual finding required for commitment is necessary to ensure due process, particularly when the civil commitment scheme is generally applicable to all federal prisoners regardless of their individual criminal histories. The court emphasizes that its holding pertains only to 18 U.S.C. § 4248 and does not affect or pertain to the remaining provisions of the Walsh Act.

Given the court's conclusions in this Order, the court will not address the remaining substantive due process and equal protection arguments also raised by respondents. The court's omission of this discussion should not be read to suggest any conclusions as to the merits of those arguments. For the foregoing reasons, respondents' motions to dismiss are ALLOWED, and the government's petitions are DISMISSED.

-58-

Given the very substantial constitutional issues of first impression in these cases and the gravity of the concerns raised by the government, the court hereby RECOGNIZES the Notice filed by the government on 15 May 2007, and temporarily STAYS the effect of this Order pending receipt of, and the court's decision regarding, the government's forthcoming motion to stay the effective date of the release of the respondents from custody in each of the cases identified in the caption of this Order.

This **7** September 2007.

W. EARL BRITT
Senior United States District Court Judge